**DICKINSON et al. v. SEAY.**

No. 8614—Opinion Filed Sept. 24, 1918.

(175 Pac. 216.)

(Syllabus.)

1. **Evidence — Opinion — Delay in Transportation—Reasonableness.**

In an action against a common carrier to recover damages for the negligent delay in the transportation of cattle from a point in this state to their destination in another state, witnesses who, from past experience, are familiar with such transportation, may properly testify as to the usual and customary time required to make such shipments, and from this testimony and other competent testimony in the case it is the province of the jury to determine whether or not the time actually taken by the carrier for the transportation of the cattle alleged to have been negligently delayed was reasonable or unreasonable.

2. **Carriers—Live Stock Shipment—Delay in -Transportation—Question for Jury.**

In such an action, the question as to what is a reasonable time for the transportation of the cattle, and as to the reasonableness and sufficiency of the excuse which the carrier makes for its delay, is for the determination by the jury, under proper instructions from the court.

3. **Evidence — Opinion — Delay in Transit —Damages.**

Where damages are claimed from a common carrier on account of weight unnecessarily lost by cattle in transit, and on account of a decrease in the market value of the cattle when they reached their destination, occasioned by the negligent delay of

the carrier in transporting the shipment, witnesses experienced in such matters may properly testify as to the loss of weight of the cattle, and as to the decrease of the market value of the cattle on account of such loss of weight, and as to the decrease of the market value of the cattle on account of injuries to the cattle while in transit affecting their market value.

## 4. Carriers—Live Stock Shipment—Delay in Transportation—Excuse by Carrier.

In an action against a common carrier to recover damages for negligent delay in the interstate transportation of cattle, where the evidence reasonably tends to show that the carrier failed to transport the cattle within a reasonable time, it is sufficient to take the question of negligence to the jury, and the presumption of negligence is not explained or rebutted by positive evidence on the part of the carrier that the regular schedule of its first train after the cattle were received by it for shipment, and by which train the cattle were moved, would not enable it to deliver the cattle at their destination within a reasonable time.

Error from District Court, Jefferson County; Cham Jones, Judge.

Action by O. W. Seay against J. M. Dickinson and H. U. Mudge, receivers of the Chicago, Rock Island & Pacific Railway Company. Judgment for plaintiff, and defendant brings error. Affirmed.

R. J. Roberts, C. O. Blake, W. H. Moore, and J. E. Du Mars, for plaintiffs in error.

Bridges & Vertrees, for defendant in error.

TISINGER, J. O. W. Seay recovered judgment in the district court of Jefferson county, against J. M. Dickinson, as receiver of the Chicago, Rock Island & Pacific Railway Company, for $125. The judgment was based on the verdict of a jury in a cause tried in that court, wherein O. W. Seay, as plaintiff, alleged that the railway company had negligently delayed the transportation of 46 head of cattle delivered to it at Oklahoma City, Okla., for shipment over its lines to the Witherspoon-McMullen Live Stock Commission Company at Kansas City, Mo. From a judgment overruling a motion for new trial, the receiver of the railway company appealed to this court.

It appears that the cattle were shipped in two cars containing 23 head each, from Ryan, Okla., to Oklahoma City, Okla., on July 19, 1915, by O. W. Seay and Clyde Seay, under a live stock contract which had indorsed on it, "With Kansas City Privileges." The cattle were consigned to the Witherspoon-McMullen Commission Company at Oklahoma City. Clyde Seay, one of the consignors, afterwards assigned his claim for damages again the railway company to O. W. Seay, who as plaintiff prosecuted this suit to judgment. The two carloads of cattle were loaded at Ryan at 7:10 p. m. July 19th, and unloaded at Oklahoma City for the market of July 20th. O. W. Seay, who accompanied the cattle to Oklahoma City, was not satisfied with the market there and availed himself of the privilege given under the live stock contract by delivering the cattle to the railway company for transportation to the consignee at Kansas City, Mo. They were billed out of Oklahoma City at the live-stock yards at 2:30 p. m. July 20th, and were unaccompanied by either of the consignors, moving en route to the Kansas City stockyards by way of El Reno, Okla., Caldwell, Herington, and Topeka, Kan., arriving at the Kansas City stockyards on the morning of July 23rd at about 7:30, after having been in possession of the railway company for about 65 hours.

Plaintiff's action is for damages caused by the alleged negligent delay of the railway company in transporting the cattle from Oklahoma City to Kansas City, alleging that the ordinary and reasonable time within which the cattle should have been transported between these points was from 30 to 36 hours.

The railway company contends that there was not sufficient proof of its negligent delay in transporting the cattle to their destination, and injury therefrom as a proximate result of such delay, to authorize the submission of these questions to the jury; and at the conclusion of the evidence it moved the court to instruct the jury to return a verdict in its favor, which motion the court overruled.

In line with its general contention as above outlined, the company contends that no competent evidence was offered in behalf of the plaintiff as to what was a reasonable time for moving the cattle from Ryan to Oklahoma City and from Oklahoma City to Kansas City.

While it is true that the cattle were first shipped from Ryan to Oklahoma City, the plaintiff does not claim any damages on account of this movement. The suit is for damages alleged to have been sustained by him on account of the negligent delay of the railway company in moving the cattle from Oklahoma City to Kansas City, and the evidence offered by the plaintiff as to the time

required to move a shipment between these two points was substantially as follows:

The plaintiff testified that he had been engaged in the business of buying and shipping cattle for the past 30 years and had shipped over the Rock Island Railroad, principally, to Kansas City, ever since the railroad was built; that he shipped 15 or 20 cars of cattle a year during this time from Ryan, Okla., to Kansas City, Mo., and that the usual time required for a shipment to go from Ryan to Kansas City was from 28 to 35 hours, he having made it in less time that 28 hours; that Oklahoma City is nearer Kansas City than Ryan, it being something like 100 miles nearer, in his opinion.

Frank Witherspoon, Jr., testified that he had been engaged in the cattle business at Kansas City, Mo., and at Oklahoma City, Okla., since he was 18 years old; that he had been selling on the Kansas City market for the past 9 years, with the exception of about 18 months when he sold cattle at Oklahoma City; that he had shipped cattle from Oklahoma City to Kansas City; and that from 28 to 30 hours was the usual and customary time for shipments to come from Oklahoma City to Kansas City over the Rock Island lines.

We are of the opinion that this evidence was admissible. The plaintiff had for a long time been engaged in the business of buying and shipping cattle to the Kansas City market. He had shipped some 15 or 20 carloads a year over the Rock Island Railroad ever since it was built through the country where he operated; and, while the cattle involved in this suit were the first he had ever shipped from Oklahoma City to Kansas City, he testified as to the usual and customary time required to move a shipment from Ryan, which was generally the initial point of his shipments, to Kansas City, and further testified that Oklahoma City was nearer to Kansas City than Ryan by about 100 miles. The witness Witherspoon had been engaged in the cattle business at Kansas City and at Oklahoma City for nine years. He had shipped cattle from Oklahoma City to Kansas City over the Rock Island Railroad and knew the usual and customary time for the movement of shipments between these two points.

By reason of their past experience, these witnesses were qualified to testify; and the evidence was competent for the purpose of showing the usual and customary time for moving cattle from the point at which this shipment was made, Oklahoma City, to their destination at Kansas City. It was then the province of the jury to determine whether or not the much longer time of 65 hours taken by the railway company to transport the cattle here involved was reasonable or unreasonable, under all the proof submitted. St. Louis & S. F. R. Co. v. Peery, 40 Okla. 432, 138 Pac. 1027; Southern Pac. Ry. Co. v. Arnett 111 Fed. 849, 50 C. C. A. 17; Ala. G. S. R. Co. v. McKenzie, 139 Ga. 410, 77 S. E. 647, 45 L. R. A. (N. S.) 18; Pecos, etc., R. Co. v. Crowley (Tex. Civ. App.) 86 S, W, 280; St. L. & S. F. R. Co v. Gunter, 44 Tex. Civ. App. 480, 99 S. W. 152; Texas, etc., R. Co. v. Crowley (Tex. Civ. App.) 86 S W. 342; Kemendo v. Fruit Dispatch Co., 61 Tex. Civ. App. 631, 131 S. W. 73; Atchison, etc., R. Co. v. Davidson, 60 Tex. Civ. App. 93, 127 S. W. 895; Texas etc. R. Co. v. Byers (Tex. Civ. App.) 84 S. W. 1087.

In addition to the testimony of these two witnesses C. L. Rupert, superintendent of the Oklahoma Division of the Rock Island Railway from El Reno to Caldwell, Kan., testified that the Kansas City stock train is due out of El Reno at 11 p. m. and into Kansas City at 4 p. m. on the second morning, thus requiring 29 hours to cover the distance between El Reno and Kansas City, which was a reasonable time within which to run that train between those two points. W. H. Dick, trainmaster, also testified that the distance from Oklahoma City to El Reno is 26 miles, and that the time required to run the freight train which handled the cattle involved in this case between these two points was 2 hours and 45 minutes; this long time being made necessary by local conditions at Oklahoma City, which compelled the train to run very slowly and carefully from the east yard to the west yard through the city, and also by reason of the handling of Oklahoma City merchandise by the train. The evidence of the railway company further shows that the distance between Oklahoma City and Kansas City is about 401 or 406 miles. All this evidence clearly shows an unusual length of time in the transportation of this shipment of cattle.

The railway company endeavored to excuse itself for the delay by showing that the two carloads of cattle were billed out of Oklahoma City too late on the afternoon of July 20th to make connection by any of its regular freight trains or any extra train with its through live stock train No. 96 from El Reno, Okla., to Kansas City, Mo., scheduled to cover the distance between those two points in 29 hours; that the next avail-

able train to move the shipment was its through freight train No. 97 from Oklahoma City to El Reno, at which place it connected with its through freight train No. 98 from El Reno to Chicago by way of Topeka, Horton, and St. Joe; this train No. 97, left Oklahoma City at 11:45 on July 20th, 1 hour and 50 minutes late, arriving at El Reno at 2:10 a. m. on July 21st., 1 hour and 50 minutes late; that the Kansas City live stock train No. 96 had left El Reno at 11 p. m. on July 20th. almost 3 hours before the cattle arrived at El Reno, and 1 hour and 20 minutes before train No. 97, which carried the cattle would have arrived at El Reno had it been on schedule time; that the schedule of the two trains did not provide for the connection between No. 97 and train No. 96 at El Reno; that train No. 98 which carried the cattle left El Reno at 4:30 a. m. on July 21st, 20 minutes late, arrived at Caldwell, 104 miles distance at, 11:35 a. m. on July 21st, 1 hour and 15 minutes late; that it left Caldwell at 2 p. m. July 21st, 1 hour and 15 minutes late; that it arrived at Herington, Kan., which is 150 miles from Kansas City, at 8:35 p. m. on July 21st; that, when the train arrived at Herington, plaintiff's cattle had been on the cars for 30 hours and 5 minutes; and that it was impossible to cover the 150 miles between Herington and Kansas City in the time left before the expiration of the 36-hour limit, provided by the federal statutes; the cattle were unloaded to be fed, watered and rested, and were taken forward from Herington to Kansas City on Thursday, July 22nd, arriving at Kansas City on the morning of July 23rd at 7:30 o'clock.

Under all, this evidence the question as to what was a reasonable time for the transportation of the cattle and the question as to the reasonableness and sufficiency of the excuse which the carrier gave for its delay was for the determination of the jury and the court committed no error in submitting this issue to the jury under proper instructions. S. L. & S. F. R. Co. v. Shepard, 40 Okla., 589, 139 Pac. 833, affirmed March 15, 1916. 240 U. S. 240. 36 Sup. Ct. 247, 60 L. Ed. 622; Buel, Pryor & Daniel v. St. L. & S. F. R. Co., 65 Okla. 108, 163 Pac. 536; St. L. & S. F. R. Co. v. Bilby, 35 Okla. 589, 130 Pac. 1089; St. L. & S. F. R. Co. v. Zickafoose, 39 Okla. 302, 135 Pac. 406; St. L. & S. F. R. Co. v. Cox, 40 Okla. 589, 139 Pac. 833; St. L. & S. F. R. Co. v. Peery, 40 Okla. 432, 138 Pac. 1027; 10 Corpus Juris, subject Carriers, section 440, page 305.

On the question of damages sustained by the plaintiff as the proximate result of the negligent delay of the carrier, the jury found that he had been damaged $25 by reason of the shrinkage of the cattle, and $100 as damages for decline in the market, these two elements of damage having been submitted under the instructions of the court.

There was no evidence submitted to the jury that the cattle were weighed at Ryan, Oklahoma, where the shipment originated, at Oklahoma City. where they were first unloaded and put on the Oklahoma City market, or at Kansas City, their final destination. The only evidence of shrinkage, or of weight lost by the cattle on account of the negligent delay of the carrier, was the testimony of the plaintiff, a cattle man of long experience in buying, shipping and selling cattle, and of Witherspoon, a cattle broker, a man of long experience in handling and selling cattle at cattle markets. The testimony of both of these witnesses was of sufficient probative value to authorize the jury to return the verdict it did return as to the loss suffered by plaintiff on account of the shrinkage of the cattle in transit caused by the negligent delay of the carrier.

They also testified to facts sufficient to authorize the verdict of the jury as to the loss suffered by the plaintiff as damages for decline in the market value of the cattle; that is, the difference between the market value of the cattle in the condition they would have arrived but for the carrier's negligent delay and their market value in the condition they were in at the time they did arrive.

The rule as to expert testimony on the question of shrinkage of cattle in transit is thus announced by the Kansas Supreme Court in the case of A., T. & S. F. R. Co. v. Watson, 71 Kan. 696, 81 Pac. 499:

"Where damages are claimed from a carrier on account of weight unnecessarily lost by cattle in transit, occasioned by a negligent delay, and the exact weight at the beginning and at the end of the journey cannot be shown, it is not error to permit persons experienced in such matters to give their opinion of the loss ordinarily resulting under such circumstances, as well as of the loss in similar cases where no delay occurs."

And in the case of Hunt v. St. L. & S. F. R. Co., 187 Mo. App. 639, 173 S. W. 61. the court says in the syllabus:

"Testimony of experienced stockmen as to what extra shrinkage such delay in shipment would produce in cattle similar to those composing the shipment was admissible."

In the case of Gulf, etc., R. C. v. House, 40 Tex. Civ. App. 105, 88 S. W. 110, the syllabus reads:

"Where in an action against a carrier for delay in the shipment of cattle it was shown that cattle would shrink from 50 to 60 pounds every 24 hours during transportation, it was not error to permit an expert to testify as to the difference in the value of cattle on account of such shrinkage."

In this case the witnesses for the plaintiff were both in the cattle business, and had been engaged in that business for a number of years. While they could not testify with absolute certainty, as in casting up the figures of an account, yet they were qualified by reason of long experience to fairly well measure the shrinkage in weight and the loss and injury to plaintiff's cattle caused by the length of time they were on the road. These matters are so well understood among cattlemen as to be sufficient to form the basis for business calculation. They are also sufficient in a judicial investigation. And evidence of this character, when submitted to a jury under proper instructions by the court, is sufficient to enable the jury to ascertain with reasonable certainty the loss sustained and the injury done, and fix the damages accordingly.

The railway company further contends that the court erred in refusing to give the jury certain written instructions, requested by it numbered from one to four inclusive.

All of these requested instructions are of similar import, and 1 and 3 are in substance as follows:

That the statutes of the United States (the Elkins Act) prohibit unjust discrimination in the movement of freight by public carriers, or the giving to one shipper special facilities of movement for the regular freight charges not given to other shippers, or to the public generally, for the same charges; and that if the movement given the plaintiff in this case was one that placed his cattle on the first market after their receipt by carrier, according to its schedule, and said schedule was adequate to handle the business offered by the public, then the plaintiff would not be entitled to recover, etc.

While positive evidence was offered by the railway company tending to show that plaintiff's cattle were moved by the first regular freight train after they were received by it, and that the regular schedules of this train and its connecting trains would not have enabled the shipment to reach its destination in much shorter time than it did reach it, we are unable to say that the court erred in refusing to give the instruction requested. As this court said in the case of St. Louis & S. F. R. Co. v. Shepard, supra:

"While it is true that positive evidence was adduced to that effect, such evidence would not rebut anything in this case nor have anything to do with it that we can see. Much less would that schedule be conclusive on the court as to what was a reasonable time in which to transport this shipment to its destination, and make it the duty of the court, as a matter of law, to hold that the schedule was conclusive on that point, and instruct the plaintiff out of court."

And in the case of Buel, Pryor & Daniel v. St. Louis & S. F. R. Co., supra, this court in passing on this question said:

"Whatever may be the holding in other jurisdictions, this court has committed itself to the doctrine that the mere proof of a schedule adopted by a railroad company and further proof that the shipment was made within the time specified within said schedule, will not excuse the railroad company, if there be proof of negligent delay in the shipment. In other words, the schedule might provide for such slow transportation that negligent delay in handling the shipment might nevertheless be proved."

We are of the opinion that the act of Congress known as the Elkins Act (Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. 1916, §§ 8597-8599]) has no application to the instant case under the evidence submitted to the jury.

The railway company's requested instruction No. 2, which was refused by the court, was also similar to its requested instructions Nos. 1 and 3. It was at follows:

"A railroad company is not required to transport cattle offered to it in less than ten carload lots in time for any particular market, or according to the demands of the plaintiff, but fulfills its duty to the public and a shipper when it transports the same in accordance with its schedule to the market and said schedule is reasonably adequate to serve the needs of the public based upon the freight offered for transportation to it."

What we have said with reference to the refusal of the court to give requested instructions numbered 1 and 3 is applicable to the refusal to give this requested instruction.

The conclusions arrived at also dispose of the railway company's requested instruction No. 4, to the effect that, if plaintiff is entitled to recover, he should be allowed only such damages as he may have suffered by reason of the failure of the railway company to make its schedule for the movement

of freight of this character between the points named. We are of the opinion that this is not a correct statement of the rule. It would have the court bound by the schedule fixed by the railway company, however slow and inadequate it might be, and, if the cattle reached their destination by such slow schedule at the time fixed by the schedule, plaintiff would be precluded from recovering from any loss he might have sustained by reason of the length of time taken by the company for transporting the shipment. Such is not the law in this jurisdiction. Buel, Pryor & Daniel v. St. L. & S. F. R. Co., 65 Okla. 108, 163 Pac. 536.

We find no reversible error in this record, and the judgment of the trial court is therefore affirmed.

All the Justices concur.